UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IRINA KONSTANTINOV, as Conservator
for the Estate of VLADIMIR
KONSTANTINOV, a mentally
incapacitated person, and
SERGEI MNATSAKANOV,

        Plaintiffs,

vs.

Case No. 04-CV-74928

HON. GEORGE CARAM STEEH

FINDLAY FORD LINCOLN MERCURY,

        Defendant.
_____/

ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DOC. 69] AND DENYING
PLAINTIFFS' EX PARTE MOTION TO FILE ADDITIONAL MATERIALS [DOC. 103]

Defendant Findlay Ford Lincoln Mercury ("Findlay Ford") is an automobile dealership with its principal place of business in Ohio. In addition to being a regular Ford dealership, for five years Findlay Ford was in the business of selling limousines, until they withdrew from that business in 1997. During that time they sold approximately two to three thousand limousines.

In 1995, Gambino's Westside Limousine Service, Inc. ("Gambino's"), a Michigan corporation, ordered a limousine from Findlay Ford with certain features. Findlay Ford purchased a new Lincoln Town Car from Ford Motor Company's Lincoln division. Findlay Ford then sold the Town Car to National Coach, a separate company in the business of converting automobiles into limousines. National Coach, while not in an exclusive agreement with Findlay Ford, did most of the modifications for the dealership.

National Coach was certified by Ford as a Qualified Vehicle Modifier ("QVM"). In this case, National Coach converted the Town Car into a limousine with the options Gambino's selected. National Coach sold the limousine back to Findlay Ford, which in turn sold it to Gambino's. All modifications were made by National Coach, and Findlay Ford did not alter or modify the limousine prior to selling it to Gambino's.

On June 13, 1997, plaintiffs Vladimir Konstantinov and Sergei Mnatsakanov were passengers in the subject limousine. Mr. Konstantinov was seated on the side-facing J-seat in the rearmost seating position, while Mr. Mnatsakanov was seated on the forward-facing rear bench seat in the left outboard seating position. None of the passengers riding in the limousine were wearing a seat belt.

The driver of the limousine, Richard Gnida, lost control of the vehicle and struck a tree on Woodward Avenue in the City of Birmingham, Michigan. Mr. Konstantinov was propelled toward the front of the vehicle, where his head impacted a partition that divided the passenger compartment from the driver compartment, causing him to suffer brain injuries. Mr. Mnatsakanov was also propelled forward, and his head collided with the partition, causing him to suffer both brain and spinal cord injuries.

Plaintiffs are suing Findlay Ford under a theory that the limousine was negligently designed, and that the design defects proximately caused their injuries when the limousine was involved in an accident. Specifically, the defects that Plaintiffs allege are that:

> The lap-belt only seat belts for the J-seat were so absurdly long, obsolete
> and difficult to use that it was virtually guaranteed that they would be
> under the seat so that Mr. Konstantinov could not see or use them. The
> buckle and webbing for the rear bench seat were unavailable and invisible
> because they were wrapped in rubber bands. It also was installed

> backwards (so the push button faced inward) and in the wrong location (criss-crossed with the center position's latch plate). It also was a 1992 seat belt (in a 1995 vehicle). Finally, *none* of the seat belt systems in the passenger compartment were equipped with stalks, guides, grommets, sleeves or other hardware to ensure that they would not get underneath the seat cushion.

Plaintiffs' response brief, p. 4 (citations to exhibits omitted).

The Court denied defendant's initial motion for summary judgment because there was still time left for discovery. The Court noted that "plaintiffs have presented very little evidence to establish that Findlay Ford was independently negligent." Discovery closed December 1, 2007. Since the last time the Court considered this case, the parties have deposed 10 current and former Findlay Ford employees and 7 current and former Ford employees. In its previous order, the Court concluded that plaintiffs had pled the elements of an implied warranty claim, in addition to negligence.

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); see also Cox v. Kentucky Dept. of Transp., 53 F.3d 146, 149 (6th Cir. 1995).

3

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also National Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. Anderson, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

4

ANALYSIS

I. Standard of Care of Non-Manufacturing Seller

The common law in Michigan was that a plaintiff did not have to show negligence on the part of a non-manufacturing seller to recover under an implied warranty theory. The plaintiff only needed to show that the product was sold in a defective condition and that the defect caused the plaintiff's injury. Piercefield v. Remington Arms Co., 375 Mich. 85 (1965). In 1996, the Michigan Tort Reform Act took effect, and it contained a section relating to the liability of sellers for items they sold, but did not manufacture. Specifically, section 2947(6) of the Michigan Product Liability Act addresses the liability of non-manufacturing sellers:

> (6) In a product liability action, a seller other than a manufacturer is not liable for harm allegedly caused by the product unless either of the following is true:
>
> (a) The seller failed to exercise reasonable care, including breach of any implied warranty, with respect to the product and that failure was a proximate cause of the person's injuries.
>
> (b) The seller made an express warranty as to the product, the product failed to conform to the warranty, and the failure to conform to the warranty was a proximate cause of the person's harm.

MCL § 600.2947(6).

The Michigan Supreme Court has not addressed the effect section 2947(6) has on the common law elements of implied warranty claims. In its prior order denying summary judgment in this case, the Court held that implied warranty claims remain distinct causes of action following tort reform legislation in Michigan, such that implied warranty claims do not require a showing of fault on the part of the non-manufacturing seller. In the current round of pleadings, and in a lively debate before the Court, there

5

has been much discussion of this legal issue. The Court is compelled to revisit the issue at this time.

The Michigan Court of Appeals has made contradictory interpretations of the statute in two unpublished decisions. In 2001, the Court of Appeals heard a case in which the plaintiff sued the seller of a deer tree stand under an implied warranty theory. In discussing § 600.2947(6), the court stated:

> Thus, a plaintiff seeking to recover from a retailer must establish: (1) that the seller failed to exercise reasonable care relative to the product at issue and (2) that the seller's conduct proximately caused the plaintiff's injuries. Additionally, the statute provides that if a plaintiff can establish a breach of any implied warranty, that will suffice for purposes of showing that the seller failed to "exercise reasonable care" as regards the product.

Adams v. Meijer, Inc., 2001 WL 1657310, *3 (2001). Under this interpretation, the common law theory of implied warranty survives tort reform.

Another panel of the Michigan Court of Appeals cited to § 2947(6)(a) to support its finding that "[u]nder Michigan law, no action based merely on a manufacturing defect may lie against a non-manufacturing seller." Hastings Mut. Ins. v. General Motors Corp., 2005 WL 711767, *2 (2005). The court reasoned as follows:

> The plain language MCL 600.2947 states that, in cases where a plaintiff brings a product liability action based on harm allegedly caused by product, the only claims that may lie against a non-manufacturing seller are those based on a failure to exercise reasonable care and those based on breach of an express warranty. If the language of a statute is clear and unambiguous, no interpretation is necessary and the court must follow the clear wording of the statute. The clear and unambiguous language of MCL 600.2947 precludes an ordinary manufacturing defect claim against a non-manufacturing seller because such a claim does not involve an allegation that the seller failed to exercise reasonable care or made an express warranty.

6

Id. at *3 (citation omitted).  This holding imports a reasonable care element into the common law implied warranty cause of action.

Plaintiffs cited to two other Michigan Court of Appeals cases in support of their argument that breach of implied warranty against a non-manufacturing seller remains a strict liability cause of action after tort reform.  Marin v. Michigan State University, 2000 WL 33529619 (2000) involved plaintiffs who became ill after eating hot dogs at a football game.  The court stated that "[t]o establish a prima facie case of breach of implied warranty, a plaintiff must show that goods were defective when they left the possession of the manufacturer or seller and that the defect caused the plaintiff's injuries."  Id. at *1. The Court of Appeals did not discuss § 2947(6), and in support of this proposition, the court cited to two cases that pre-dated the 1996 Tort Reform Act.  In other words, the court applied the common law rule of Piercefield without any consideration of the tort reform statute.

Federal courts in this circuit are split in their opinions regarding the effect § 2947(6) has on the traditional elements of implied warranty claims.  In one case, the Sixth Circuit held that a plaintiff seeking to recover on a claim against a retailer for breach of implied warranty must merely establish that the product was sold in a defective condition, and that the defect caused plaintiff's injury.  Hollister v. Dayton Hudson Corp., 201 F.3d 731, 737 (6th Cir. 2000).  The Hollister case, as defendant points out, was filed in 1996, before tort reform and MCL §600.2947(6) took effect.  The Sixth Circuit did not cite to or discuss §600.2947(6) because the case arose before that section's enactment.  For this reason, Hollister is irrelevant to any discussion of implied warranty in the post- tort reform period.

A case from this district held that the breach of any implied warranty requires no proof of independent negligence on the part of the seller. Siedlik v. Stanley Works, Inc., 205 F.Supp.2d 762, 764 (E.D. Mich. 2002). The court relied on Hollister to support its conclusion that § 600.2947(6) did not add an element of fault to traditional implied warranty claims. The holding in Siedlik can be dismissed due to the fact that it improperly relies on Hollister, which was a pre-tort reform case.

Another case from this district, Mills v. Curioni, involved a suit by a man whose hand was crushed while he was operating a cardboard box assembly machine. Plaintiff claimed he was injured by a defective product that was purchased from the non-manufacturing defendant. The court analyzed a non-manufacturing seller's liability under §600.2947(6). The court looked to the Legislature's intent, as described in the Senate Fiscal Agency's report on the product liability measures of Michigan's tort reform legislation:

> By holding sellers responsible for their own wrongdoing, the bill would eliminate unnecessary and burdensome legal costs and insurance premiums. Since manufacturers ultimately indemnify sellers for the harm caused by the manufacturers' own products, claims should be brought directly against them.

238 F.Supp.2d 876, 886 (E.D. Mich. 2002) (citations omitted). Based on the court's understanding of the legislative intent, as well as case law, the Mills court held that a "seller's duty under Section 2947 is based on whether it knew or should have known of the alleged danger." Id. at 887.

More recently, the District Court decided Coleman v. Maxwell Shoe Co., Inc., 475 F.Supp.2d 685 (E.D. Mich. 2007). The plaintiff claimed a shoe she purchased from J.C. Penney, a non-manufacturing seller, was defective after the strap broke as she was

8

walking. It was undisputed that the shoe was defective, but it was also undisputed that J.C. Penney had not been negligent in failing to detect the defect. The sole issue was whether section 2947(6) allowed the plaintiff to prevail on an implied warranty claim against a non-manufacturing seller where there was no evidence that the seller was independently negligent. The court concluded that "both the language of §600.2947(6) and the legislative intent behind the statute show that non-manufacturing sellers cannot be held liable for damages due to breach of implied warranty, unless they failed to exercise reasonable care." Id. at 691.

After more careful consideration of the issues, this Court agrees with the reasoning of Hastings, Coleman and Mills, and holds that non-manufacturing sellers can be held liable for breach of implied warranty only if it is shown that they failed to exercise reasonable care, that is, that they knew or had reason to know of the alleged defect.

II. Evidence of Independent Negligence

    A. Standards in the Industry

To establish a seller's "independent negligence" under MCL §600.2947(6), plaintiff must show that the seller knew or had reason to know the product was defective. A seller has no duty to inspect a product unless the seller has reason to know that it is defective or the defect is readily ascertainable. Stachurski v. K-Mart Corp., 180 Mich. App. 564, 567 (1989), Warner v. General Motors, 137 Mich. App. 340, 346 (1984).

In 1968, Federal law required manufacturers to install seat belts in passenger cars and light trucks. In 1995, the term "passenger car" was defined by Federal statute

9

as a vehicle designed to carry not more than 10 individuals. 49 USC 30127(a)(3) (1995 version); 49 C.F.R. 571.3. Plaintiffs contend that the limousine in this case falls under the Federal statutory definition of passenger car. It is safe to say that having seat belts was a standard in the "passenger car" industry in 1995, but it is less clear what other safety technology relating to seat belts was standard at the time.

Plaintiff argues that Findlay Ford knew about the seat belt "stalk" technology, knew that such devices were an "extension of the actual seat belt," and knew that they existed as a fixed "receptacle for the seat belt" so that the belt "sits above the level of the seat." Findlay Ford also knew that the limousine at issue did not have such devices. (Stanley Kujawa dep. pp. 47-48, Exhibit 5). Mr. Kujawa is Findlay Ford's owner.

Joseph Willis, a seat belt expert and former Ford engineer, testified to the availability of supports or devices, sleeves or stocks, to keep the buckles on the seating surface. Mr. Willis testified, "we've had guides forever." He also testified that grommets, sleeves, and guide devices to maintain the buckle above the seat were common in Ford vehicles in 1995. (Exhibit 20).

Defendant submits photographs of passenger cars, but not specifically limousines, during the relevant time period, showing safety features designed to prevent seat belt hardware from going under the seat. (Exhibits 21-28). In addition, the expert report of Stephen Syson cites to a survey conducted for purposes of this lawsuit:

> This survey illustrates a mainstream commitment by the passenger car industry throughout the 1990s (and long before that) to seriously address the crucial safety issue of maintaining seat belts at or above the seat cushions for the safety of the traveling public. Thus the industry itself recognized the fact that if such design changes were not developed and implemented, then seat[] belts will commonly end up under the seats and

>unavailable to passengers, a situation which was expressly recognized by NHTSA in the 1985 NHTSA document . . . .

(Syson, Exhibit 14, p. 16). Syson summarizes his findings by stating, "it is well known in the automotive industry that when there are no safety devices to keep all necessary parts of a seat belt restraint system above the seat cushion, it is very predictable that one or all of these necessary parts will end up under the seat cushion, out of sight and inaccessible to the passenger, which poses a grave safety problem." (Syson, Exhibit 14, p. 19).

Defendant's expert Mr. Gratzinger stated in his report that plastic stiffeners were part of the original 1995 Town Car design, but were not present on the subject vehicle when it was inspected after the accident. (Gratzinger Report, p. 6, Exhibit 1).

Defendant's response to evidence that stalks, and other devices intended to prevent seatbelts from sliding into seats and becoming inaccessible, were common in the passenger car industry in 1995, is that it has never been standard for such devices to be used in limousines. In support of this view, defendant submits the following evidence.

Ron Zeien, quality control manager for National Coach, testified he attended 30 limousine trade shows from 1985 through the early 2000s. He saw 60 to 100 limousine models built by competitors at each show, and they all contained seat belts that were no different than the ones used by National Coach for the J seat of the subject limousine. He does not recall ever seeing any stalks or other devices in any limousines. (Zeien dep., pp. 118-122, Exhibit A).

11

Dawn Council worked as a driver and office manager for Gambino's. In 1996 she started her own limousine company. She testified that the seat belts for the side and rear facing seats in the limousines she has owned are no different than the ones used in the limousine at issue. This includes 1997, 1998, 2000 and 2001 Lincoln Town Car limousines built by companies other than National Coach.

Bob Gratzinger, one of Findlay Ford's experts, conducted a survey of the seat belts in newer model limousines and found them to have similar designs as the subject limousine's belts without stalks, grommets or similar devices on the side and rear-facing seats. (Gratzinger report, pp. 2 and 8, Exhibit C).

In this case there is evidence to establish an issue of fact whether seat belt design devices, such as stalks, were standard in the industry that includes limousines.

    B. <u>Findlay Ford's Reliance on National Coach</u>

Plaintiffs argue that it was grossly negligent for Findlay Ford to rely on National Coach to design and manufacture a safe limousine. Plaintiffs present evidence to show that Findlay Ford knew that National Coach was an unreliable and dishonest contractor. This evidence includes the affidavit of Terry Gaw, who was in charge of quality control at National Coach in 1995 and 1996. The Court finds there is an issue of fact whether it was grossly negligent for Findlay Ford to rely on National Coach to design and manufacture a safe vehicle. However, at trial, only evidence having a connection to the issue of seat belts and Findlay Ford's knowledge will be deemed relevant, and therefore admissible, in this case.

III. <u>Limitations Period</u>

The accident occurred on June 13, 1997, and plaintiffs filed this action on December 17, 2004. For the first time, defendants raise the issue that plaintiffs' lawsuit is time barred by the three-year statute of limitations. MCL 600.5805(13). There is a tolling provision, which applies in this case. Section 600.5851(1) provides that "if the person first entitled to . . . bring an action under this act is . . . insane at the time the claim accrues, the person or those claiming under the person shall have 1 year after the disability is removed . . . to . . . bring the action although the period of limitations has run." Both plaintiffs suffered severe brain injuries in the accident, so the statute of limitations would run during those periods when plaintiffs could comprehend their rights or someone was empowered to pursue this action on their behalf. The court has not received factual information to establish when a conservator was appointed for plaintiff Konstantinov or an attorney in fact for plaintiff Mnatsakanov.

Defendant concedes that there is an issue of fact regarding the competency of plaintiffs for purposes of determining whether the statute of limitations bars this action.

## CONCLUSION

For the reasons given above, defendant's renewed motion for summary judgment is DENIED. In addition, plaintiffs' ex parte motion to file additional materials in opposition to defendant's motion is DENIED.

                          s/George Caram Steeh
                          GEORGE CARAM STEEH
                          UNITED STATES DISTRICT JUDGE

Dated: January 28, 2008

## CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record on January 28, 2008, by electronic and/or ordinary mail.

                          s/Josephine Chaffee
                          Secretary/Deputy Clerk