UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IRINA KONSTANTINOV, as Conservator
for the Estate of VLADIMIR
KONSTANTINOV, a mentally
incapacitated person, and
SERGEI MNATSAKANOV,

        Plaintiffs,

Case No. 04-CV-74928

vs.

HON. GEORGE CARAM STEEH

FINDLAY FORD LINCOLN MERCURY,

        Defendant.
_____/

ORDER DENYING PLAINTIFFS' MOTION FOR NEW TRIAL [DOC. 237]
AND GRANTING DEFENDANT'S MOTION TO STRIKE AFFIDAVITS [DOC. 240]

Plaintiffs filed this motion for new trial on June 10, 2008, moving to set aside the jury verdict returned on May 23, 2008. Thirteen days later, on June 23, 2008, plaintiffs filed three affidavits in support of their motion for new trial. Fed. R. Civ. P. 59(c) provides that when a motion for new trial is based on affidavits, they must be filed with the motion. There is no provision in the Rules for giving the moving party an extension for good cause, nor did plaintiffs seek an extension in this case. The Court therefore GRANTS defendant's motion to strike plaintiffs' untimely affidavits.

## **BACKGROUND**

This claim arises out of a limousine accident causing very serious injuries to the plaintiff passengers who were not wearing seat belts at the time. The defendant is a non-manufacturing seller of the limousine who was accused of negligence in the sale of

1

the vehicle which took place about two years before the accident. Plaintiffs' negligence theories generally involved assertions that the vehicle was defective because the seat belts were not readily accessible to passengers and that the dealer should have known of the defects and corrected them prior to sale.  The parties agreed that defendant could be held liable only if it knew or should have known of a defect prior to selling the limousine.

Trial in this matter commenced on April 28, 2008.  During jury selection, the Court told the prospective jurors that they should plan to be in trial until approximately May 23, 2008, the Friday before Memorial Day weekend.  This was an outside estimate based on the attorneys' predictions of the time needed to put in their proofs.  Out of respect for the jurors' time and sacrifices, as well as the needs of other litigants to have access to the Court, an effort was made to manage the trial process to produce a smooth and efficient presentation while affording both sides fair opportunity to support their respective claims.  This goal was particularly challenging for the Court in this case due to the attorneys' inability to work out ANY of the routine issues that arise during trials.

Other than a preplanned break of three-and-a-half days in the schedule, the trial proceeded with very few interruptions.  Plaintiffs presented their case in approximately nine trial days, and defendant presented its case in approximately four days.  Closing arguments were presented Friday morning, May 23, 2008.  The jury was instructed immediately following plaintiffs' rebuttal argument, and was sent to begin their deliberations at 4:11 p.m.  The jury had a few questions concerning the viewing of specific evidence, which the Court ruled upon.  At 5:48 p.m. the jury came back with its

no-cause verdict. This resulted from the jury's determination of the very first question presented, rendering it unnecessary to consider any of the other issues, including proximate causation, in the case.

Plaintiffs filed this motion for new trial claiming a litany of errors made by the Court. Plaintiffs claim that their brief is not intended to delineate all of the errors made during the trial, and if their motion for new trial is denied, "a much more extensive and comprehensive delineation of the errors will be made." (Brief in Support of New Trial, footnote 2). A court may grant a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R. Civ. P. 59(a). The Sixth Circuit has interpreted Rule 59(a) to require a new trial when the jury has reached a seriously erroneous result, as evidenced by the verdict being against the weight of the evidence, the damages being excessive, or the trial being unfair to the moving party in some fashion. Holmes v. City of Massillon, 78 F.3d 1041, 1045-46 (6th Cir. 1996).

**ARGUMENT**

I. <u>Testimony of Stanley Kujawa</u>-Owner of Defendant Ford Dealership

Plaintiffs argue that their substantial rights were prejudiced by the improper testimony by Stanley Kujawa about his financial situation and good character, which was deliberately designed to improperly appeal to the sympathy and prejudice of the jury. The testimony referred to by plaintiffs concerns, in part, Mr. Kujawa's description of his involvement in humanitarian activities outside his dealership. Mr. Kujawa testified on direct examination about his involvement in running "Medical Equipment Services Abroad" (MESA), adopting two children from El Salvador, and establishing and raising

3

funds for a children's home in El Salvador. Plaintiffs contend that this testimony amounts to character evidence that is inadmissible under FRE 404(a), providing that evidence of a person's character is generally not admissible for the purpose of proving action in conformity therewith on a particular occasion.

The Court concluded the evidence was not sought by defendant to prove that Mr. Kujawa acted in conformity with his character at the time of sale. Mr. Kujawa's testimony regarding his Rotary Club activities, his children, and his activities outside of the dealership are, as defendant contends, "simply background information about Mr. Kujawa." Such evidence is always of value to the fact finder in assessing the credibility and weight of the testimony on disputed issues. The testimony filled in the background narrative, and a party has considerable leeway on direct exam for proof of facts that do not bear purely on the legal issues. United States v. Blackwell, 853 F.2d 86, 88 (2nd Cir. 1988).

Plaintiffs and their family witnesses were examined at great length about every aspect of their lives, about their childhood in Russia, about adjusting to life in the United States, and about acts of kindness to others. This is the same type of "background narrative" the Court permitted with regard to Mr. Kujawa. "Broad discretion is given to district courts in determinations of admissibility based on considerations of relevance and prejudice, and those decisions will not be lightly overturned." United States v. Chambers, 441 F.3d 438, 455 (6th Cir. 2006). The Court does not find that the very limited (9 questions) background information about Mr. Kujawa, the representative of defendant, provides grounds for a new trial.

Plaintiffs also object to Mr. Kujawa's testimony concerning the impact witness

4

Rick Manley's fraud scheme had on Findlay Ford. Mr. Kujawa testified that he considered Mr. Manley's criminal fraud as money stolen from Findlay Ford's employees, not from Findlay Ford, and that it was tantamount to stealing money from Findlay Ford employees' pension program. Plaintiffs first raised their objection to this testimony the day after it was elicited. The Court noted during a sidebar:

> Well, certainly I tend to agree that first of all, that the testimony by the witness was not contrived to elicit pity. He was, indeed, reporting I think the experience that he had with Mr. Manley and the impact it had on him and, of course, to the extent that the answer may have been unresponsive, that might have been a bell for plaintiff to object at the time and to approach the sidebar to ask for a caution to avoid later repetition, but the – I really don't think – I mean, the likelihood of any impact on the jury's willingness to award damages to me seems remote. These are not totally unsophisticated people. Most would, I assume know that there is insurance involved in defending the claims, and if they didn't make that assumption, they would at least have enough questions about it and will be cautioned presumably at some point in the instructions not to make awards out of sympathy or bias or prejudice for either side. I just don't see this as anything close as a basis for a mistrial.
>
> I will ask Mr. Feeney to caution his client to avoid repeating the risk that was created – that was created by Mr. Manley's wrongdoing . . . .

(Trial Transcript, May 21, 2008, pp. 50-51).

As the Court ruled during the sidebar conference, plaintiffs' objection to Mr. Kujawa's testimony during trial came too late, and in any event does not provide the basis for a mistrial. Plaintiffs' theory was that Mr. Manley provided Findlay Ford knowledge of National Coach Engineering's quality control problems. In this way, plaintiff argued, Findlay Ford was on notice of potential defects triggering a duty to inspect. It was certainly appropriate for Mr. Kujawa to explain that he had no knowledge of Mr. Manley's fraudulent activities involving National Coach Distributors, and how Manley concealed his crimes against Findlay Ford. None of Mr. Kujawa's challenged

5

testimony provides a basis for granting a new trial in this case.

II. <u>Claimed Juror Misconduct</u>

Plaintiffs next contend that beginning during their cross-examination of Mr. Kujawa on May 21, juror #6 began outwardly displaying hostility to plaintiffs' counsel. Plaintiffs first raised the matter before the Court on May 23:

> Over the last few days, myself and others on our side of the table have developed a great concern about one of the jurors, namely Number 6 who has been acting out very powerfully whatever words are against our side of the table. On a number of occasions she actually mouthed words that you can make out the words that she's saying, both directed toward myself and Ms. Kalahar, and there are other people who are also in the courtroom who made notes and noticed her behavior in this respect. It is openly hostile. She has used words like shut up toward Ms. Kalahar, and words like stop toward me when I get up, and – and it's very obvious there are other people who have similar observations of her behavior. I want to bring this matter up to the Court and – and frankly request some remedy for this in the nature of a recusal or exclusion of this juror from deliberation.

(Trial Transcript, May 23, 2008, pp. 16-17).

The claim by plaintiffs' counsel that a juror mouthed the words "shut up" during the examination of a witness was first addressed after the close of evidence, after the jury instructions were resolved by the Court, and just minutes before closing arguments were to begin. This claimed conduct was not observed by the Court or brought to the Court's attention when it was said to have occurred.

Despite repeated admonishments by the Court during this month long trial, plaintiffs' counsel persistently engaged in obstructionist, hostile, and unprofessional conduct in the courtroom. Continuous personal attacks on opposing counsel and sarcastic, hateful remarks combined with endless repetition in the presentation of evidence contributed to justifiable frustration among jurors who participated in this case

6

at incredible personal sacrifice. It is hardly reasonable for counsel to intentionally create a poisonous, hostile atmosphere, and then blame the jurors for being affected by it.

Frustration exhibited by jurors is insufficient to establish juror bias or misconduct. Peterson v. Warren, No. 04-CV-72299-DT, 2007 WL 496683, at *7 (E.D. Mich. Feb. 13, 2007) ("the juror's comments merely showed that the jurors in [the] petitioner's case were becoming frustrated by the many delays in the case. This is insufficient to establish juror bias or misconduct."). It is within the trial judge's sole discretion to handle alleged juror misconduct or bias as he sees fit "[b]ecause of his continuous observation of the jury in court. . . . " United States v. Panebiaco, 543 F.2d 447, 457 (2nd Cir. 1976) (the court further noted, "[t]hat jurors react naturally does not mean they are biased.")

Moreover, it is apparent that the jurors in this case admirably performed their jobs under very difficult circumstances. They rigorously reviewed the evidence relating to the initial question presented, that is whether the dealer-defendant was negligent in failing to identify and remedy the claimed defects in the seatbelt assemblies. Plaintiffs' theory was that the claimed defects should have been obvious to the dealership prior to delivery to purchaser, and the jury correctly found otherwise. Despite plaintiffs' claim that the jury was rushed to judgment, its findings required consideration of relatively little evidence. The verdict was consistent with that evidence. The jury never had to address the more difficult issues of causation, comparative fault, non-party fault, and damages.

III. Allowing Jury to Examine Rear-Bench Seat

During their deliberations, the jury submitted a note to the Court asking for

permission to look at the J-Seat and rear bench seat models that were in the courtroom. Plaintiffs objected to the jury looking at the rear bench seat because they argued it was not an exhibit. Plaintiffs further objected to the jury looking at both seats because doing so would encourage improper jury experimentation.

The rear bench seat, which was created by plaintiffs, was on plaintiffs' exhibit list, was in the courtroom during the entire trial, was used extensively by plaintiffs and defendant throughout trial with numerous witnesses, and was repeatedly referred to by plaintiffs' counsel as an exhibit. After the jury requested to look at the two seats, the Court and counsel for both parties discussed whether it had formally been moved into evidence during trial. Mr. Feeney offered it into evidence during this discussion on the record:

> If for any reason this is not been offered or received, I will renew it, and ask that it be marked as Plaintiff's Exhibit 5, I think, and be received just as I have reserved with regard to a number of exhibits which were also not identified, which have not been placed on the record, pursuant to the Court having given me the opportunity to do that. So I would like to do that.

(Trial Transcript, May 23, 2008, pp. 146-147).

The Court agreed that the back bench seat was an exhibit at trial and proceeded to admit it into evidence:

> So I will grant the request that this item was repeatedly referred to, I know during the course of the evidence phase of the trial by both sides, probably more often by the plaintiff than the defendant as an exhibit in the case. It would never qualify as a demonstrative for the Court, and it would be unfair to prevent the jury from examining it, but there should be some ground rules.

Trial Transcript, May 23, 2008, p. 152).

The Court then instructed the jury as follows:

8

> We believe that you know from the testimony in the case, and from the representations of counsel, that these were belts duplicative of a number of conditions of the actual seats that existed of the subject limousine in the case. These are seats in the place that have been produced, and so each is built individually, and it may well be that certain aspects of the seats is not exactly the same as the actual limousine that existed. The key parts of these seats that were the subject of demonstrations during the course of the trial were built as far as duplicates of the actual seats. The manner in which the belts were affixed and presented were done as much possible to duplicate the conditions as well.
>
> However, there may be – there may be aspects of the seats, especially aspects not subject of testimony that don't exactly duplicate those original seats, and we don't want you to approach your examination of these seats with the idea, for example, that something which wasn't the subject of testimony must be exactly as it was in the subject seat. They could under the circumstances and in recreating the seats, but because they are not mass produced and tolerance were not the primary concern of the builder of these, you shouldn't assume that they are, and so that is the caution that I want to give you in your examination of them.

(Trial Transcript, May 23, 2008, pp. 153-154). The jury was allowed to examine the two limousine seats in the closed courtroom for a very short time period. The Court does not have a record of the exact amount of time, but it does know that the courtroom was cleared for the jury for no more than ten minutes. Thereafter the jury returned to the jury room and announced it had a verdict at 5:48. (Trial Transcript, May 23, 2008, p. 154).

Plaintiffs contend that the jury conducted improper experimentation on the seats, but this Court disagrees. During its ten minute inspection, the jury appears to have done the same things it repeatedly saw demonstrated during trial. On the J-seat model, the seat belts had been pushed into the seats and were not visible when the jury examined the seat. The jurors apparently pulled the seat belts out from the seat bight of the J-seat, as that is where they were found after the jury completed its examination.

9

The fact that the belts might then have been draped over the seat back, as plaintiffs contend, is of no relevance. On the rear bench seat, the same set of belts and the same configuration of those belts as when the accident occurred were present. The buckles for the center and right rear seating positions had the 1995 seat belts that plaintiffs argued should have been used in the limousine. The left seating position had the 1992 buckle hardware. Plaintiffs had installed all of these belts in these configurations during the trial, and reversed the buckle and latch plate at issue just before the jury entered the room to examine the seats. This was explained to the jury as well, before their examination of the evidence. In fact, jurors reported to this judge while the Court distributed its certificates of appreciation that the only purpose of the request to inspect the seats was to assess whether a casual observation of the 1992 belt assembly by the dealer would be a "red flag" triggering a duty to inspect further.

The jury's examination was entirely proper, and there can be no prejudice to plaintiffs resulting from the jury having done the same things that they saw demonstrated throughout the trial, on seats that had been admitted into evidence.

IV. <u>Jury Coerced to Reach Verdict</u>

Plaintiffs contend that the jury was coerced to rush to judgment and reach its verdict on Friday, May 23, 2008, the date before the Memorial Day weekend. This alleged coercion was at the hands of defense counsel and the Court. That the jury reached their verdicts in under an hour and a half, on the Friday before a holiday weekend, is not evidence of coercion. Any comments made by the Court during the course of the trial were intended to move the case along, out of respect for the jurors' time. The Court in no way indicated to the jury that they ought to come back with a

10

verdict in any specific time-frame. In fact, when the jury asked if they could stay late to deliberate, the Court responded: "my feeling is that if you want to stay for awhile, we will stay at least until six. Your cars are secured, and retrievable until 10:00 tonight." (Trial Transcript, May 23, 2008, p. 150). The jurors were clearly given the flexibility to continue deliberations or break for the weekend at their option. Plaintiffs have not brought forth any evidence of improper coercion of the jury in this case.

V. <u>Surprise Testimony Regarding Findlay Ford Practice of Inspecting Limousines</u>

Plaintiffs allege that witnesses improperly testified for the first time at trial about a practice that Findlay Ford had of inspecting its limousines before sale to make sure that the belts were laid out on the seats. This testimony came from Mr. Kujawa, Brad Redman, and Ron Crawford. In earlier deposition testimony, both Kujawa and Redman testified that Findlay Ford conducted no inspections of the limousines once they arrived at Findlay Ford from National Coach. At trial, Crawford first testified on direct examination by plaintiffs' counsel that there was no inspection. The next day Crawford said that he had a practice of regularly preparing the vehicles for delivery, making sure the belts were laid out on the seats. Defendant also admitted in the Joint Final Pretrial Order that it conducted no inspection.

Plaintiffs have not supported their argument of "ambush" with any affidavits, citations to the trial record, or deposition testimony from the witnesses. Defendant challenges plaintiffs' allegation that the Joint Final Pretrial Order contains an admission that defendant did not conduct inspections, and plaintiffs have not included any citations for the Court to verify.

It is inaccurate to call what happened at trial an "ambush" when Brad Redman

11

and Ron Crawford were subpoenaed and called by plaintiffs, not defendant. Contrary to plaintiffs' argument, the trial testimony is not inconsistent with previous deposition testimony. In their depositions, plaintiffs questioned the witnesses regarding whether Findlay Ford performed the same pre-delivery inspection required by Ford after the limousines were returned from National Coach. This was admittedly not done. At trial, the witnesses were asked about what was done to clean the limousines or make sure the seat belts were presentable prior to delivery. In addition they testified that the long drive back to Ohio from the limousine converter accomplished the same purpose as the pre-delivery inspection of new vehicles done pursuant to contractual agreements with Ford. Even if this was somehow inconsistent testimony at trial, plaintiffs were given ample opportunity during cross-examination to use prior testimony for impeachment.

It is worth noting that plaintiffs' own theory and claims evolved through multiple twists and turns after summary judgment motions and the Court was quite permissive in allowing plaintiffs such latitude, despite defendant's own protestations of "ambush."

VI. <u>Verdict Against Weight of Evidence</u>

Plaintiffs contend that the jury's verdict is against the weight of the evidence. However, plaintiffs never moved for a directed verdict or judgment as a matter of law and, therefore, are precluded from now challenging the sufficiency of the evidence post-trial. "[A] party who has failed to move for a directed verdict at the close of all the evidence, can neither ask the district court to rule on the legal sufficiency of the evidence supporting a verdict for his opponent nor raise the question on appeal." <u>Portage II v. Bryant Petroleum Corp.</u>, 899 F.2d 1514, 1522 (6th Cir. 1990).

Even if plaintiffs were permitted to challenge the sufficiency of the evidence, this

case does not warrant a new trial on that basis. The Sixth Circuit has stated the standard that should apply to motions for new trial based on an against-the-weight-of-evidence theory: "The court is to accept the jury's verdict if it is one which reasonably could have been reached." Denhof v. City of Grand Rapids, 494 F.3d 534 (6th Cir. 2007). The jury finding of no negligence in this case was supported by substantial evidence. Plaintiffs were unable to produce a single dealer in the United States who opined or practiced the kind of vehicle inspection plaintiffs theorized should have been performed by the defendant in this case. Plaintiffs' claim that defendant should have known all of the nuances of the design requirements of Federal Motor Vehicle Safety Standards, and identified the claimed deficiencies in an inspection of the belt assembly systems was contrary to the evidence and common sense. Virtually all of the evidence in the case established that the limousine's seat belts would have functioned properly and protected plaintiffs from injury if they had been worn. On that basis alone, the Court would not overturn the verdict as being against the weight of the evidence.

VII. Court Erred in Submitting Issues of Law to Jury

    A. Violation of FMVSS 208 S7.4.6.1

Plaintiffs contend that the Court should have decided as a matter of law that the J-Seat violated FMVSS 208 S7.4.6.1 because it allegedly lacked guides or conduits, and erred in submitting this issue to the jury. The issue of interpreting FMVSS 208 and its regulations was first presented to the Court on the eve of trial, in the form of trial briefs filed by both parties. The Court did interpret the safety standard and ruled that FMVSS 208 required some type of guide or conduit. The Court left the issue of whether the limousine at issue complied with the safety standard:

13

> Defense counsel I know wishes to argue that the particular system in place in this vehicle included a means by which the belt would be maintained on top of seat or one part of the belt would be maintained on top of the seat. I'm not sure exactly what the expert testimony is about that, whether there's an argument that the – that there was some type of a de facto conduit of some type in place in the vehicle system. I really can't preclude that argument if there is some support for it, and I'm not sure if conduit of some type necessarily has a clear and unmistakable meaning, but the – so I guess there's a number of factual issues that the parties will be arguing to the jury ultimately, but that's the interpretation that the Court gives to this language.

(Trial Transcript, May 13, 2008, pp. 13-15). The Court again referred to the fact that compliance was an issue in the case, as follows:

> In fact, at the time of my ruling, I left open the question whether he could establish that this particular mechanism included the use of some type of conduit.

(Trial Transcript, May 14, 2008, pp. 54-55).

Findlay Ford's seat belt expert, Bob Gratzinger, testified that the J-Seat's bight line acts as a *de facto* conduit for keeping the seat belts on the seats. (Trial Transcript, May 21, 2008, pp. 124-125). See Powers v. Bayliner Marine Corp., 83 F.3d 789 (6th Cir. 1996) (holding that evidence, including testimony that a sailboat's design did not violate safety standard, supported the jury's conclusion that the sailboat was not defective). It was properly left to the jury to decide whether the subject limousine violated FMVSS 208 as interpreted by the Court, as this was a question of fact on which reasonable minds could differ.

Of course, violations of Federal Motor Vehicle Safety Standards may establish negligence on the part of a manufacturer, like National Coach in this case, but have little to do with the findings of the jury of no negligence by the defendant as a seller of the vehicle.

14

B. Violation of FMVSS 208 S7.2

Plaintiffs argue that the Court should have instructed the jury that the latch plate mechanism violated FMVSS 208 S7.2 because it allegedly was not accessible in its stowed position. The Court declined to give the requested instruction because "the experts were never asked about this issue, and the . . . Court really was never advised of it until in (sic) end point of the trial. It would be unfair to . . . open that issue now." (Trial Transcript, May 23, 2008, p. 13). While plaintiffs contend that defendant repeatedly admitted that Gambino's and others stowed the latch plate in an inaccessible location, they do not cite to the record to support such contention. This argument does not provide a basis for granting a new trial.

C. Partnership and/or Joint Venture

Plaintiffs allege that the Court erred in not ruling as a matter of law that Findlay Ford was National Coach's partner or joint venturer, and the Court should have instructed the jury to assess any fault by National Coach as the vehicle modifier against Findlay Ford. On May 21, 2008, plaintiffs filed their Trial Brief Regarding Allocation of Verdict [Doc. #227]. In this brief, plaintiffs asked the Court to remove National Coach from the verdict form. Then, on the last day of trial, immediately prior to closing arguments, plaintiffs' counsel raised the "partnership/joint venture" issue with the Court. However, plaintiffs did not submit any proposed jury instructions regarding partnership or joint venture, so plaintiffs cannot claim that the Court erred in failing to give such

instruction. Fed. R. Civ. P. 51(d)(1)(B).

VIII. Miscellaneous Arguments

On May 16, 2008, juror Mr. Han arrived at Court sick and was obviously unable to participate. This day was scheduled to be a full day of trial, so the Court made the determination to excuse Mr. Han from his jury service, over plaintiffs' objection. The Court explained that there was no way of knowing how long Mr. Han would be incapacitated and events like this are the very reason additional jurors are selected.

## CONCLUSION

For the reasons stated above, plaintiffs' motion for new trial is DENIED, and defendant's motion to strike affidavits is GRANTED.

Dated: July 28, 2008

S/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on July 28, 2008, by electronic and/or ordinary mail.

s/Josephine Chaffee
Deputy Clerk